## Joel W. Hopkins v. Nelson Cofoid et al.

1. PRACTICE—*Determining the Legal Effect of Court's Action on a Certain Day.*—Where a decree is followed by other orders the same day, all are to be construed together in determining the legal effect of the court's action on that day.

2. SAME—*Cross-Bill—Foreclosure.*—The day before a foreclosure decree a defendant, who was a judgment creditor of the mortgagors, filed a bill attacking a deed by the mortgagors to their son, as fraudulent. The decree found said son the owner of the equity of redemption, but based no directions upon that finding, and only ordered the surplus brought into court. The same day the court denied a motion to strike the cross-bill from the files, and ruled defendants to answer it by the next term. *Held*, that the cross-bill was not barred by the decree; that the determination that the son was the owner of the equity of redemption was only as to the issues previously made up, and that the meaning of the entire proceedings of that day was to permit the issue as to the validity of the deed as between the judgment creditor and the son, to be afterward determined, and the surplus disposed of accordingly.

3. HOMESTEAD—*Where Right Does Not Extend Beyond Tract upon Which Home Buildings Are Erected.*—If the forty-acre tract upon which the home buildings are situated is worth $1,000, the right of the homestead does not extend beyond that tract.

4. SAME—*Insufficient Allegations to Treat Surplus After Sale of Homestead as the Avails of a Homestead.*—Where, in a foreclosure suit, a tract of 100 acres, composed of two forty-acre tracts and parts of two other forties, was sold for $6,000, and there was a surplus arising from said sale which was claimed by a subsequent judgment lienor, and the answer averred the premises were homestead, and the proof showed the homestead was somewhere upon said 100 acres, but the proof did not show, nor the answer aver, upon which forty it was located, *held*, there was neither averment nor proof under which said surplus could be treated as the avails of a homestead.

**Bill to Foreclose Mortgage.**—Appeal from the Circuit Court of Putnam County; the Hon. LESLIE D. PUTERBAUGH, Judge presiding. Heard in this court at the April term, 1902. Reversed and remanded, with directions. Opinion filed July 18, 1902.

FRED T. BEERS, attorney for appellant.

BARNES & MAGOON, attorneys for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

In a certain consolidated foreclosure suit against Nelson Cofoid and Elizabeth Alpharetta Cofoid, his wife, a decree of sale was rendered June 12, 1900, under which a sale was had, and after satisfying the mortgages foreclosed and the costs, the master reported a surplus, which was afterward reduced to $479.15. On June 11, 1900, the day before said decree, Joel W. Hopkins, a judgment creditor of Nelson Cofoid and wife, and a defendant in said consolidated foreclosure suit, filed a cross-bill therein, alleging that a certain deed of the mortgaged lands by said mortgagors and judgment debtors, Nelson Cofoid and wife, to their son, Harry H. Cofoid (herein called Harry for brevity), was without a *bona fide* consideration and was fraudulent as to creditors, and asking that the rights of Harry in said lands be decreed to be subject to his judgment lien. Afterward another foreclosure suit was brought against Nelson Cofoid and wife by the Peru State Bank, and the Hopkins cross-bill was consolidated therewith by agreement. The bank had

a decree for the sale of other lands, not included in said former foreclosure decree but included in the deed to Harry. A sale under that decree and payment of the mortgage debt and costs, left a surplus of $311.60 arising from that foreclosure. In that Peru bank case Hopkins filed another cross-bill attacking said deed to Harry in like terms. The three Cofoids seem to have assumed Hopkins had three cross-bills, one in each of the two cases originally consolidated, and one in the Peru bank case, and they filed a joint answer to the Hopkins cross-bill in each of said three cases, each denying fraud and setting up what was claimed to be a valuable consideration. Thereupon the Hopkins cross-bills were heard, all the pleadings and proofs and masters' reports in all the prior cases being used in evidence by agreement. The court, on October 30, 1901, determined that Hopkins was barred by the decree of June 12, 1900, and directed said surplus sums paid to Harry as the owner of the equity of redemption. It is proper to say that the decrees of June 12, 1900, and October 30, 1901, were not by the same chancellor. This is an appeal by Hopkins from the decree of October 30, 1901, disposing of the two surplus sums arising from said two foreclosures.

The first question is whether the decree of June 12, 1900, was a bar to Hopkins' efforts to show that the deed to Harry was in fraud of creditors, and that his judgment should be paid out of the surplus notwithstanding said deed. The Ream foreclosure suit came first, with several cross-bills to foreclose mortgages. In that case there was no cross-bill attacking the deed to Harry, or raising any issue upon it. That case was referred to Casson as master to report proofs and conclusions. He reported the proofs and recommended a decree for the sale of the premises, for the payment of the mortgages and costs, and that the surplus be brought into court to await its further order. Said report gave the dates and amounts of the several judgments, including that of Hopkins, but made no recommendation as to their payment. Hopkins filed objections to this report, because the master failed to find that Harry had no

equity in the lands involved in that case. The three Cofoids filed objections because the master failed to find that Harry was the owner subject to certain incumbrances, and because the master should have recommended that the surplus be paid to Harry. These objections were overruled, and Hopkins renewed them as exceptions to the report. The Dick (or Skeel, executor,) foreclosure came next, with several cross-bills. One cross-bill was by Daill. Nelson Cofoid and wife had given Casson a mortgage and he had assigned the mortgage and the note secured thereby to Daill. Thereafter Casson, apparently forgetting the assignment and thinking the debt was paid, released the mortgage on the record. This let in the deed to Harry ahead of said released mortgage. The deed to Harry expressed that it was subject to all liens against the lands by mortgage or otherwise which Harry should pay, but this meant existing liens and not liens which had been released of record. Daill's cross-bill sought to set aside the release and restore his mortgage, and attacked the deed to Harry as in fraud of creditors. The Cofoids answered, denying the deed was fraudulent. Hopkins answered, admitting it. This Dick (or Skeel) case was referred to Patterson as special master to take and report the proofs, which he did, without conclusions. The causes were then consolidated and heard and the decree of June 12, 1900, rendered.

In the "finding" part of the decree it was found that the report of the master in the Ream case should be overruled as to the liens of the judgments of Hopkins and certain others "as against the rights and interests of the defendant Harry H. Cofoid." This was without force and meaning, for the master had made no finding at all as between the lien of Hopkins' judgment and the rights of Harry, but had merely recommended that the surplus, after paying the mortgages and costs, be brought into court. The court in effect sustained the Daill cross-bill by giving him a lien subject only to certain prior incumbrances, but superior to all other defendants, which included Harry; but the proofs tend to show this was by agreement, and that

the Cofoids surrendered to the Daill cross-bill, and agreed that the decree give Daill's released mortgage the preference over the deed to Harry. The court found that Nelson Cofoid and wife conveyed the premises to Harry, and that the latter took title, and is the owner of the equity of redemption in the premises, subject only to the mortgage liens; and that at the execution and delivery of said deed to him, he executed and delivered to his mother notes for $4,000, and executed a mortgage upon said premises to his father to secure them. The court, however, did not follow up this finding of fact by a decree to pay to Harry the surplus left after the mortgages and costs had been satisfied, or to pay it to his mother, but only directed that the master bring the surplus into court to abide its further order, which was just as Master Casson had recommended. Nothing was decreed by reason of said finding. The findings are but a preservation of the evidence. There must be some decree based upon them before any one is bound.

But that was not all the court did in said consolidated cause on the day of that decree. As already seen, when the consolidated cause was heard, there was no pleading presenting for litigation the validity of the deed to Harry, except the Daill cross-bill, and that was practically sustained by the court, for his mortgage was restored as against the deed to Harry filed for record after the Casson (Daill) mortgage had been released, which could not have been done if Harry had been treated by the court as a purchaser in good faith for a valuable consideration. If this was done by consent of the Cofoids, it was none the less the substantial accomplishment of the purposes of the Daill cross-bill. Hopkins' objections and exceptions to the report of Master Casson were properly overruled, because when the consolidated cause was heard, which was a long time before the decree was entered, Hopkins had no pleading which raised any such issue. But the day before the decree of June 12th, Hopkins filed a cross-bill attacking the deed and raising the issues of its validity between himself and Harry, and entered his motion for a rule on the Cofoids to answer it.

On the day the decree was entered the Cofoids moved to
strike the cross-bill from the files. The court denied that
motion and ruled the defendants to answer the cross-bill by
the first day of the next term. This order appears to have
been made on June 12th, as it is preceded and followed in
the record by other motions and orders on that date.
Though this order is not attached to the decree, all are
parts of what the court did in that cause on that day, and
have the same effect as if all entered in the formal decree.
If the finding of fact that Harry was the owner of the
equity of redemption, subject only to the mortgages, is con-
strued as barring Hopkins, then it was a mere mockery to
enter the further order refusing to strike his cross-bill from
the files and ruling defendants to answer his allegations
that the deed to Harry was a fraud upon Hopkins. The
court will not readily adopt such a construction. When all
the orders of that day are construed together, their mean-
ing appears to be, first, that Daill's cross-bill was well
taken so far as his own interests were concerned, but that
his allegation of fraud could not avail other defendants
who had not filed a cross-bill attacking the deed; second,
that as to all issues which had been raised by pleadings
filed before the hearing, Harry owned the equity of redemp-
tion, except as to the mortgages, but that the Hopkins cross-
bill should remain upon the files and the Cofoids should
answer it, and an issue should be thus raised between them
as to the validity of the deed, as against the rights of Hop-
kins, and that that issue should thereafter be tried in that
cause at the next term or later, and that the surplus should
be brought into court to await the trial of that issue. The
directions to bring the surplus into court is consistent with
that construction, while if the decree had been intended as
a bar against Hopkins it would naturally have directed that
the surplus be paid to Harry, and that Hopkins' cross-bill
be stricken from the files. The refusal to strike the cross-
bill from the files was equivalent to leave to file it, if leave
were necessary, because presented after the hearing. The
reason why the court did not, by its decree of June 12th,

direct that the surplus be paid to Harry was obviously because there had been a cross-bill filed the day before which disputed his right thereto, which cross-bill the court determined should be answered. and an issue made up on that subject between Hopkins and Harry, and tried thereafter, the decision of which issue would determine to whom the surplus should be paid. The result of appellees' contention would be to hold that the chancellor said to the parties by the decree and orders of June 12th:

" I conclusively decree that Harry owns the equity of redemption and the right to any surplus as against all parties to this suit, but I will permit defendant Hopkins to amuse himself by a futile attempt to further litigate said question with Harry at the next term."

The court did not mean that. It meant Harry was the owner by virtue of his deed, as the pleadings stood at the hearing, except as to Daill, but that Harry's rights as between him and Hopkins should be determined under the cross-bill just filed, which the court ruled the Cofoids to answer by the first day of the next term. When all the orders of June 12, 1900, are considered in their relation to the issues theretofore litigated, and to the known fact of the filing of this cross-bill, and its recognition by the court, we conclude no bar was intended or erected, and that that decree was not a bar to relief to Hopkins under his cross-bills.

Was the deed made to defraud the creditors of Nelson Cofoid and wife, and especially Hopkins? The proof warrants the conclusion that it was. Nelson Cofoid and his wife had given numerous mortgages upon their lands, and were heavily indebted outside the mortgages. Nelson Cofoid testified that these were his debts and not his wife's, but as early as 1883 she became liable with him upon the Dick note and mortgage, and she was a signer with him as an apparent joint maker upon much of his other paper. in evidence. When this deed to Harry was executed Hopkins had brought an action at law against Nelson Cofoid and his wife, and had got service upon Nelson and was about to take judgment against Nelson, and did so about

four days later, bringing in Mrs. Cofoid by *scire facias* at another term. Harry was a young man, married, living away from his father's home, on a small salary, not intending to go into the farming business, and having no capital with which to purchase this farm of about 320 acres. Harry was called as a witness by those who were opposing his deed. We have read his examination as given in full in the record, as well also as that of his father. Harry's usual answer was either that he did not remember or that he refused to answer. It is clear that Harry knew nothing about the transaction except that a deed of all the land had been made to him, and he had executed some notes for an unknown amount, and a mortgage, and turned them all over to his mother to save her from his father's debts. He could give no details except when his own counsel put them into his mouth by leading questions. The father claimed he owed Harry $900 or $1,000 for borrowed money, and this deed was also to pay that. Yet the son could not name a single date or item of this supposed debt, and the only note ever given between them the son still retained. Harry had received money in Chicago for stock and produce sold from the farm, and doubtless money had sometimes passed between father and son, but we think it evident the father did not owe his son, except upon the unsurrendered note. But, further, the answers filed by the Cofoids to the Hopkins cross-bills do not, any of them, set up any such consideration, or any debt from Nelson to Harry paid by this deed. Those answers state that the consideration was that Mrs. Cofoid had a valid and existing claim against her husband for $4,000, and in consideration thereof Cofoid sold the lands to Harry, and Harry assumed and agreed to pay said debt, and executed his notes to himself for that sum, and a mortgage securing them upon said lands, and assigned said notes to his mother in payment of her husband's liability to her. They stated no other consideration. Nelson testified his wife owned an undivided half of a hundred-acre tract included in some of these mortgages, and that he owed her because she had mortgaged her land

for his debts.   But it will be noted that she does not ask to have her mortgage enforced and the surplus paid to her thereon.   No attempt was made to have that done in the court below.   The reason for this omission is obvious.   Mrs. Cofoid is a defendant in Hopkins' judgment.   If she were awarded the surplus under her mortgage it would at once be applied by the court upon the judgment Hopkins has against her.   Hence the effort of the entire family here is to have it paid to Harry, regardless of the mortgage he has given, though Harry has never paid anything for the land. It is worthy of note that the theory of the consideration for the deed to Harry and mortgage and notes back by him on October 21, 1897, contained in the answers of all the Cofoids to the Hopkins cross-bill, differs entirely from that previously stated by said parties in former pleadings in the cause.   In Harry's answer filed March 10, 1898, to the Dick foreclosure bill, he set out in detail that on said October 21, 1897, his father, Nelson Cofoid, owed him, Harry, $4,000, and to secure the same signed and delivered his mortgage upon the lands in question, which was duly recorded and became a first lien, etc.   On October 26, 1898, the answer of all the Cofoids to Daill's cross-bill was filed, in which they mention "the mortgage coming due from Nelson and Elizabeth Cofoid to the said Harry H. Cofoid," and state when it was made, and that it was given to secure an honest and valid debt, etc.   In the answer of all the Cofoids to the cross-bill of Jones and Hutchins filed October 31, 1898, they "hereby expressly set up the mortgage of these, Nelson and Elizabeth A. Cofoid, to the said Harry H. Cofoid, as set up in the answer of the said Harry herein filed to the original bill," and averred it was a valid and subsisting lien, etc.   These pleadings, filed from March 10, 1898, to October 31, 1898, from five months to a year after the deed to Harry was made, when the transaction was fresh in the minds of all parties, shows that it was then intended to support the transaction upon the theory that Nelson owed his son $4,000, and that the transaction of October 21, 1897 (the date of the deed to Harry and mort-

gage back), was intended as mere security to Harry for that debt of $4,000. When they came to answer the Hopkins cross-bill in May, 1901, they had entirely changed their theory, had abandoned their theory of a debt from Nelson to Harry secured by the deed, and had substituted a debt from Nelson to his wife, assumed by Harry, as the consideration for this deed. But the debt is still $4,000. This unexplained change of base tends to characterize both theories as unreal and fictitious. The testimony given by Harry and his father might be discussed at much length, but we think it unnecessary. We are of opinion Harry has no title to the surplus which should be permitted to prevail in a court of equity, as against Hopkins' judgment.

The answers say the lands conveyed to Harry were the homestead of Nelson Cofoid and his wife. It is not in fraud of creditors to convey even as a gift the homestead estate of $1,000 in value. But this land, located in nine different forty-acre tracts in three different sections, could not all be homestead, and the answers do not designate which tract was the homestead. If the particular forty-acre tract upon which the home dwelling was located was worth $1,000, the right of homestead did not extend beyond that tract. Miller v. McAlister, 197 Ill. 72. There was therefore no allegation in the answer showing that the conveyance of some particular part of this farm was not fraudulent as to creditors because it was the homestead. As allegations and proofs must correspond, the defense of homestead, if proven, could not prevail. But the proof on that subject was only that a certain one-hundred-acre tract was the homestead. That tract was the south five-eighths of the west half of the northeast quarter of section eleven, and the south five-eighths of the east half of the northwest quarter of the same section. In other words, it consisted of two forties, and of two tracts of ten acres each, off the south side of two other forties. The one hundred acres sold at the master's sale for $6,000, so the homestead apparently could not have extended beyond a forty. If the dwelling was in fact upon one of

the ten-acre tracts, and it was worth $1,000, the homestead would not extend beyond that ten acres, being all the land owned by the parties in that forty.   A careful examination of said master's report shows that said first named surplus of $479.15 was produced from the sale of that one hundred acres, and not from the other lands sold under the first decree.   But it is impossible to know how much was derived from the sale of that which was in fact homestead, and the proper subject of a gift to the son.   For lack of either definite allegation or definite proof, the record fails to show any right in Harry to retain said surplus as against Hopkins, the judgment creditor of his father and mother, because of the existence of a homestead.

Appellant has assigned errors upon other parts of this record which can not be considered upon this appeal, which is only from the decree of October 30, 1902, and therefore they will not be discussed.   The decree appealed from is reversed, and the cause remanded to the court below, with directions to enter a decree in conformity with this opinion and to order the master to pay Hopkins' judgment out of said surplus.   The costs of this appeal will be adjudged against the three Cofoids.